(77 South. 8)

PORTSMOUTH COTTON OIL REFINING CORP. v. MADRID COTTON OIL CO.
(4 Div. 657.)

(Supreme Court of Alabama. Nov. 15, 1917.)

1. BROKERS ⊙≈91 — AGENCY — SECRET INSTRUCTIONS.

A "broker" is an agent acting under a limited authority usually authorized to buy or sell a particular thing in specified quantities, and, though to bind his principal he must keep within the limits of the authority conferred upon him, yet secret instructions conflicting with the usual or apparent powers of a broker will no more affect the rights of third persons dealing with him in good faith in ignorance of his instructions than in the case of an ordinary agent.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Broker.]

2. BROKERS ⊙≈103—ESTOPPEL OF PRINCIPAL —WHAT CONSTITUTES.

Defendant authorized a broker to sell for it cotton oil. The broker notified defendant on October 24th of a sale to plaintiff, and defendant, though notifying the broker on November 4th that the oil had been otherwise disposed of, did not notify plaintiff of that fact or in any way question the contract until November 13th. At that time defendant refused to perform the contract on the ground that a tank for the oil had not arrived in time, and did not until November 16th, after being notified that plaintiff would hold it liable for loss on account of failure to deliver the oil, repudiate the contract on the ground of the broker's want of authority. *Held*, that defendant was estopped from denying the authority of the broker, not having denied it promptly and in the meantime in effect speculated on a decrease in the price of the oil.

3. BROKERS ⊙≈106—ESTOPPEL OF PRINCIPAL —EVIDENCE.

Where, in an action for defendant's breach of a contract made through a broker, defendant was estopped to deny the authority of the broker, evidence tending to discredit the broker's authority was improperly received.

4. WITNESSES ⊙≈408 — IMPEACHMENT — EXPLANATION OF CONTRADICTION.

In an action by plaintiff on a contract of sale with defendant entered into through medium of a broker, where defendant was allowed to introduce telegrams which the broker sent to other parties after the date of the alleged sale to plaintiff, the broker was, despite the rule that a witness is not allowed to testify as to the object and purpose of a given act, etc., entitled to explain the sending of such telegrams, for they were offered as contradictory statements to impeach him.

5. DEPOSITIONS ⊙≈95 — ADMISSIBILITY — ANSWER TO PART OF INTERROGATORIES.

The answer of a party to a part only of the interrogatories propounded by an adverse party cannot be received in evidence.

6. WITNESSES ⊙≈379(10) — CROSS-EXAMINATION—DEPOSITIONS ON FORMER TRIAL.

For the purpose of impeaching a witness he may be questioned as to his interrogatories on a former trial, and, if he admits the statements inquired into, the cross-examiner is not under the burden of introducing the whole of his answers to interrogatories on the former trial.

7. APPEAL AND ERROR ⊙≈1057(1)—REVIEW—HARMLESS ERROR.

The exclusion of evidence is not prejudicial where the matters excluded are otherwise established.

8. WITNESSES ⊙≈330(1)—CROSS-EXAMINATION —SCOPE.

In an action on a contract of sale, plaintiff is entitled to cross-examine the manager of defendant as to whether the manager, after receiving a letter from the broker inclosing a contract of sale, notified the broker or plaintiff that defendant would not carry out the contract.

9. TRIAL ⊙≈255(2) — INSTRUCTIONS — REQUEST.

Party desiring charge on a special issue is bound to request the same.

Appeal from Circuit Court, Houston County; H. A. Pearce, Judge.

Action by the Portsmouth Cotton Oil Refining Corporation against the Madrid Cotton Oil Company. From a judgment for defendant, plaintiff appeals. Reversed and remanded.

E. S. Thigpen, of Dothan, for appellant. Farmer & Farmer, of Dothan, for appellee.

MAYFIELD, J. The report of this case on a former appeal—to be found in 195 Ala. 256, 71 South. 111—gives a sufficient statement of the case for the purposes of this appeal. On the former appeal it was said:

"This record shows beyond doubt that appellant did purchase, through Hewitt, and on the terms named, and that appellee declined to sell or ship on those terms, after demand by appellant; that the price of oil was higher, at the time for delivery, than it was at the time of the alleged sale by appellee to appellant; and that the latter went into the market and purchased the oil at an advanced price over the alleged contract price. There is no doubt that Hewitt was a broker merchant, and that as such he was held out by the defendant to the plaintiff as its agent to sell its oil, and that as such agent he sold the oil to plaintiff, and that defendant declined to be bound by the contract of sale made by its agent. This is shown by a telegram from defendant to Hewitt, of date October 24, 1914,

which read as follows: 'Offer tank of oil for, immediate shipment. [Signed] Madrid Oil Co.' Acting on this, and other undisputed authority from defendant, the broker did sell two tanks of oil, one for immediate delivery, and one for November delivery, at 26.55 cents per gallon.

"So far as this plaintiff is concerned, in connection with the sale in question, Hewitt was the agent of defendant, and as such agent sold the oil to plaintiff. The plaintiff did not engage him to buy the oil for it, but the defendant engaged Hewitt to sell the oil for it—not especially to this plaintiff, but to any one who would purchase it. It is true there is some evidence tending to show that defendant sold the oil directly to Hewitt, but there is no evidence to show that plaintiff purchased directly from Hewitt. But all the evidence shows that plaintiff only purchased through Hewitt as a broker and as defendant's agent in selling the oil. There can be no doubt that Hewitt was authorized by the defendant to sell the oil in question, and that he did sell it to the plaintiff. There is nothing in this record to show, or to even put plaintiff on notice, that Hewitt was acting in bad faith to his principal, or was even violating any instructions given him by his principal.

"We are of the opinion that the record shows conclusively that Hewitt was a commercial broker, and was so known to both the plaintiff and the defendant, and that defendant authorized him, as such broker, to sell for it the oil in question."

As we read the record, the same facts are shown on this appeal. We do not overlook that part of the record in which the witness Watford, general manager of defendant, claims that he contracted to sell the oil in question to the witness Hewitt, the broker who sold it to plaintiff, and that the defendant made no contract with the plaintiff as to the sale of the oil. Notwithstanding this claim and assertion of the witness, the undisputed evidence shows that Hewitt was a mere broker, and not a purchaser or seller of oil in his own right; and that both parties to this suit knowingly dealt with him in this transaction as such broker.

[1] So far as this plaintiff is concerned, the defendant is estopped to claim that Hewitt was not its agent in making this sale to plaintiff.

On the former appeal we quoted the law on this subject from Mr. Mechem, as follows:

"A broker in the ordinary case is known to be an agent acting under a limited authority. He is usually authorized to buy or sell a particular thing in specified quantities and at a limited price. He is often described in the books as a special agent, and in order to bind his principal he must keep within the limits of the authority conferred upon him. Secret or private instructions, as that term has heretofore been defined, which conflict with the usual or apparent powers, will no more affect the rights of third persons who in good faith deal with the broker in ignorance of them than in the case of dealing with any other agent, though their violation may make the broker liable to his principal." Agency, vol. 2 (2d Ed.) p. 1966, § 2397.

[2] The documentary evidence in this case estops defendant from disputing the fact that Hewitt was its agent in this matter of the sale of oil to plaintiff. On October 24, 1914,

the date of the inception of this particular contract of sale, defendant wired Hewitt, the broker, who had theretofore acted as its agent in selling oil for its account, as follows:

"Madrid, Ala., Oct. 24–14.
"C. G. Hewitt, Montg'y, Ala.
"Offer tank of oil for immediate shipment.
"Madrid Cotton Oil Co."

This was an instruction or direction by the defendant-principal to its agent, Hewitt, to offer the oil for sale in the market, for the principal. It was no offer to sell the oil to Hewitt. The telegram, in connection with the undisputed evidence in the case, is not susceptible of the construction which the witness of defendant attempts to place upon it—that it was an offer by the defendant to sell to Hewitt. It was a request from the defendant to Hewitt, as its agent, to offer the oil for sale in the general market. Having on this date made Hewitt its agent to sell, and Hewitt having sold to plaintiff, the defendant is estopped from denying the agency.

On October 27, 1914, Hewitt, the commission merchant, wrote defendant as follows, inclosing sale contract with plaintiff, or its agent:

"Oct. 27th, 1914.
"Madrid Cotton Oil Company, Madrid, Ala.—Gentlemen: I beg to confirm the sale for your account to-day to Mr. John Aspegren, New York, as per the inclosed contract. Kindly sign and return to me the four white copies, retaining the yellow copies for your files, and I will let you have the buyer's acceptance in due course of mail.
"Thanking you for this business, I am
"Yours very truly."

The defendant neither replied to this letter nor returned the contract of sale. This conclusively shows that it knew Hewitt was making the sale for defendant to plaintiff, and was not buying for himself. With this information, the defendant said nothing till November 4, 1914, when it wired Hewitt as follows:

"Madrid, Ala., Nov. 4, 1914.
"C. G. Hewitt, Montgomery, Ala.
"Haven't heard from tank car so have sold elsewhere.        Madrid Cotton Oil Co."

To this telegram Hewitt wired answer as follows:

"11/4/14.
"Madrid Cotton Oil Co., Madrid, Ala.
"Telegram received. Oil sold according to your instructions. You must fill contract.
"C. G. Hewitt."

On the 13th, 14th, and 16th, days of November, defendant wired plaintiff as follows:

"Campbellton, Fla., Nov. 13, 1914.
"Portsmouth Cotton Oil Refg. Corpn., Portsmouth, Va.
"We wired Hewitt not having heard from tank car sold oil elsewhere. Dates show that immediately you billed out car. The tank has arrived and to show you that we are as fair as you will load this tank for one cent under to-day's market if you will have your bank wire Dothan National Bank they will pay draft for the car's net weight here if you accept to-day if not will have tank returned.
"Madrid Cotton Oil Co."

"Madrid, Ala., Nov. 14, 1914.
"Portsmouth Cotton Oil Refg. Corpn., Portsmouth, Va.
"One tank of oil already gone. Accept my proposition other or will sell it to-day. Answer quick.                    Madrid Cotton Oil Co."

"Dothan, Ala., Nov. 16, 1914.
"Portsmouth Cot. Oil Ref. Corpn., Portsmouth, Va.
"My proposition must be accepted or tank goes empty. Have you any proof of purchase of oil from us? No not even a telegram.
"Madrid Cotton Oil Co."

After this, plaintiff wired defendant as follows:

"Portsmouth, Va., November 16, 1914.
"Madrid Cotton Oil Company, Madrid, Ala.
"Telegram received. We reiterate our position. If you think you have any cause at all will gladly arbitrate. In meantime will hold you for any damages unless you comply with the contract which we have done."

"November 23, 1914.
"Madrid C. O. Co., Madrid, Ala.
"Portsmouth and Railroad advise you have failed to fill tank sent you to cover contract through Hewitt for prompt tank and that you refuse to do so under circumstances please be advised that we have bought in to cover for your account a tank at four sixty seven holding you for the difference.
"John Aspegren, President,
"Portsmouth C. O. Refg. Corp."

"December 1, 1914.
"Madrid C. O. Co., Madrid, Ala.
"On account of your not having loaded tank number fifty six on November contract and contract time expired yesterday we have bought in to cover for your account one tank at five naught seven per hundred pounds.
"John Aspegren, Pres.,
"Portsmouth C. O. Refg. Corpn."

. It is impossible to escape the conclusion that on the 24th day of October, 1914, defendant authorized Hewitt as its agent to offer the oil in question for sale in the market, and that, as such agent, he did offer the oil, and made a sale to plaintiff in three days thereafter, notifying defendant of the fact and inclosing to defendant a bill of sale thereof, showing all the terms of the transaction; that defendant never, until the 13th day of November, communicated with plaintiff at all about the matter, either to deny the authority of Hewitt to sell for it, or to disclaim the sale or dispute the terms of sale. On this date its refusal to perform was attempted to be justified on the ground that the tank or receptacle for shipping the oil had not arrived. On the 14th, it offered to ship to plaintiff, but at a price which, though less than the market price, was in excess of that stipulated in the contract. On the 16th, after it was notified that it would be held liable for loss on account of failure to ship, defendant for the first time denied the sale or disputed the terms thereof, although it had had in its possession, for weeks, the bill of sale giving all the terms. We are now speaking of its communications to plaintiff, not of those to Hewitt. We are not unmindful of Watford's testimony as to his conversations with Hewitt over the phone.

If the defendant's theory of the case is correct, it was the duty of the defendant to act promptly, when it was informed in writing that Hewitt had sold the oil to plaintiff for the defendant; and to do then, what it did on November 16th, deny the sale, and the authority of Hewitt to make the sale for, or to bind defendant in the premises. The law will not allow a seller to remain silent, and hold the buyer to be bound if the price of oil declines, and not bound if it goes up—as the undisputed evidence shows it did in this case—before the time for delivery. If one maintain silence when in conscience he ought to speak, the equity of the law will debar him from speaking when in conscience he ought to remain silent. In Dann v. Cudney, 13 Mich. 239, 87 Am. Dec. 755, this doctrine was applied. Estoppels worked by negligence or silence are just as effective and righteous as if worked by misrepresentation or other active fraud. He who is silent when he ought to speak will not be allowed to speak when he ought to keep silent. When one of two innocent parties must suffer a loss on account of the wrong of a third party, he who allowed the third party to commit the wrong must suffer it.

[3, 4] If Hewitt had no authority to sell for defendant as he did, and the price of oil advanced between the time of sale and that of delivery, then the natural effect of Hewitt's exceeding his authority was to injure plaintiff or cause it to suffer a loss. If he had no authority to so bind defendant, the latter, of course, knew it, and was in duty bound to notify plaintiff of the facts and the truth of the matter as soon as it was informed of the sale on its account by Hewitt. This it did not do, but chose to speculate on the price of oil's going up or down, before it was required to deliver. And this it could not lawfully do, at the expense of plaintiff. From this it follows that the trial court erred in allowing defendant, over the objection of plaintiff, to introduce in proof telegrams which Hewitt sent to third parties, between the 24th and the 27th of October, offering the oil in question for sale. The trial court also erred in declining to allow Hewitt to explain the circumstances under which he sent the messages to these third parties, as tending to show the object and purpose of them; that is, that he was not offering the oil for sale on his own account as a broker, but on the account of the defendant, and that he owned no oil at the time he sent the messages. The only conceivable relevancy of the messages was to contradict Hewitt as plaintiff's witness. The messages, on their face and unexplained, had this tendency, and the jury possibly so read and considered them; but, if the witness had been allowed to explain them and to show the object and purpose thereof, they would rather have tended to corroborate him than to contradict him.

This is a well-recognized exception to the rule that a witness is not allowed to testify

as to the object and purpose of a given act, words, or deed of his, which, unexplained, tends to impeach or contradict his testimony on the trial. Evidence consisting of conclusions and inferences of the witness is usually inadmissible: As to whom the witness thought he was dealing with. Manchester Fire Ass'n Co. v. Feibelman, 118 Ala. 308, 23 South. 759. As to why a party did or did not do an act. Lytle & Co. v. Bank of Dothan, 121 Ala. 215, 26 South. 6. As to why a party knew a fact. Alabama Great Southern R. R. Co. v. Burgess, 114 Ala. 587, 22 South. 169. Whether a party would have acted differently. Nor can a witness give his reason or motive for doing an act. Southern Railway Co. v. Shelton, Adm'r, 136 Ala. 191, 34 South. 194. As a rule, a witness cannot testify to his intent, reason, or motive; but there is an exception to the rule when impeachment is attempted: The witness may then rebut or explain contradictory statements and may state whether he has a reason for making such statement. Carwile v. State, 148 Ala. 576, 39 South. 220; Williams v. State, 123 Ala. 39, 26 South. 521.

As we have said above and on former appeal, these telegrams to third parties were not admissible against this plaintiff. We know of no rule of law, and can see no reason for, binding the plaintiff by them. We did not reverse on the former appeal as for the rulings in admitting them in evidence, for reasons there stated, because the plaintiff had first offered such proof, and because, if conceded to be proper evidence for defendant, it was reversible error to decline to allow plaintiff to introduce similar telegrams, thus showing all that was done by Hewitt in the matter; and, if improper evidence for defendant was let in, then plaintiff should have been allowed to rebut it, if he could, by like evidence.

[5, 6] It was also error to decline to allow plaintiffs to cross-examine defendant's witness Watford as to his answers to interrogatories on the former trial. This was not an attempt on the part of the plaintiff to offer a part only of the answer of a party to interrogatories propounded by the adversary party—which, of course, cannot be done —but it was merely an attempt to lay a predicate for contradicting him as to statements or matters elicited on a former trial.

The cases on this subject were reviewed by this court in the appeals of Grasselli Co. v. Davis, 166 Ala. 477, 52 South. 35, and Birmingham Railway, Light & Power Co. v. Bush, 175 Ala. 49, 56 South. 731, and the rule here applicable was stated as follows, in the latter case:

"In the Grasselli Case, supra, it was said that merely showing the answer to the witness would not be introducing it in evidence, and the action of the trial court in refusing to permit the defendant to lay a predicate for impeachment, by asking the plaintiff on cross-examination whether he had not made contradictory statements when examined under the statute, was held for error. The effect of this was to decide that a party who has taken the deposition of his adversary under the statute may use a part of it for the single specific purpose of impeachment without making the whole evidence, and we think this a sound rule. We think, also, that, when a party so uses a part of his adversary's answer, the adversary party may use such other parts of his answer as may serve to explain the contradiction."

If the witness had answered the propounded question in the affirmative, then the contradictory statement would have been admitted, and there would be no need of introducing the written answers in whole or in part. If he had answered in the negative, then the plaintiff would have been put to the necessity of introducing the whole, or of allowing the defendant to introduce the others. There was in this case, however, no offer to introduce the whole, or only a part. The only use made of the answer was to allow the witness an opportunity to inspect the writing before requiring him to answer the question which was proper and necessary.

[7, 8] It was also error to decline to allow plaintiff, on the cross-examination of witness Watford, to show that the witness who was defendant's general manager, and acted for it in the dealings with Hewitt and plaintiff, did not, after receiving the letter from Hewitt enclosing the contract of sale, notify Hewitt or plaintiff that defendant would not fill the contract. We would not be willing to reverse on this point alone, however because it was otherwise shown what witness did, and did not do in this matter. But it would be proper on another trial to require the witness to answer these specific questions. The plaintiff, as a part of his right of cross-examination of this material witness, could require him to answer fully and specifically these questions, and not merely indirectly, as he did, in his own way, and in answer to other questions.

[9] We find no error as to any part of the oral charge to which a sufficient exception was reserved. It is true that the court failed to instruct the jury as to the doctrine of estoppel, which was applicable, but there was no specific request so to charge.

There was no error in refusing any of the plaintiff's requested charges; they were either the general affirmative charge, or were calculated to mislead the jury.

There was a jury question in whether or not the plaintiff complied with its part of the contract, in forwarding the car for the shipment.

Reversed and remanded.

ANDERSON, C. J., and SOMERVILLE and THOMAS, JJ., concur.